**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **CYNTHIA E. PRUITT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:08CV20 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Cynthia E. Pruitt for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., and Supplemental Security Income under Title XVI of the Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 14). Defendant has filed a Brief in Support of the Answer. (Doc. No. 17).

**Procedural History**

On July 26, 2006, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on July 1, 2003.[1] (Tr. 106-09, 157-59). This claim

---

[1]Plaintiff previously filed an application for a Period of Disability, Disability Insurance Benefits, and Supplemental Security Income Benefits on February 3, 2005. (Tr. 14). Those applications were denied on June 8, 2005, and were not pursued any further. (Id.). The ALJ

was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated May 22, 2007. (Tr. 92-97, 14-26). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on December 6, 2007. (Tr. 10, 4-6). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## **Evidence Before the ALJ**

### A. **ALJ Hearing**

Plaintiff's administrative hearing was held on March 6, 2007. (Tr. 29). Plaintiff was present and was represented by counsel. (Id.). The ALJ began the hearing by admitting the exhibits into the record. (Id.).

The ALJ then examined plaintiff, who testified that she completed high school and received additional training as a certified nurse's aide ("CNA"), a medical technician, and a licensed practical nurse ("LPN"). (Tr. 30). Plaintiff stated that she had applied for unemployment benefits sometime between 2000 and 2002. (Id.). Plaintiff testified that she never filed a claim for workers' compensation benefits. (Id.). Plaintiff stated that she had not attended vocational rehabilitation. (Id.). Plaintiff testified that she took additional courses to maintain her LPN and CNA certification. (Id.).

Plaintiff stated that she served time in prison from July 2005 to November 2005. (Tr. 32). Plaintiff testified that she was convicted of possessing methamphetamine. (Id.). Plaintiff stated that she has been in jail three or four times. (Id.). Plaintiff testified that she last spent time in jail

found that no grounds existed to reopen this prior determination. (Id.).

in May of 2005. (Id.). Plaintiff stated that she was arrested for DUI or DWI twice. (Id.).

Plaintiff testified that she has been through rehabilitation for alcohol or drugs at least three times. (Id.). Plaintiff stated that she last underwent rehabilitation at Gibson Recovery from December 2005 through 2006. (Tr. 32-33). Plaintiff testified that she was only required to attend a twelve-week program, but she continued to attend classes for approximately a year. (Tr. 33).

Plaintiff stated that she is unable to work because she has right shoulder pain due to arthritis. (Id.). Plaintiff testified that Dr. Nabil Majid, who has an office in Bloomfield, diagnosed her with arthritis one month prior to the hearing. (Id.). Plaintiff stated that she had experienced problems with her right rotator cuff for three to four years. (Id.). Plaintiff testified that she underwent x-rays and MRIs, which revealed that her rotator cuff was torn and that she had arthritis in her shoulder and right hip. (Tr. 34).

Plaintiff stated that she experiences shortness of breath when she walks long distances. (Id.). Plaintiff testified that she has been diagnosed with anxiety and high blood pressure. (Id.). Plaintiff stated that she takes medication for these impairments. (Id.). Plaintiff testified that she weighed approximately 300 pounds. (Id.). Plaintiff acknowledged that her shortness of breath on exertion could be caused by her obesity. (Id.). Plaintiff testified that her doctors have advised her to exercise and reduce her weight, although they have not given her specific exercises to do. (Id.).

Plaintiff stated that she is also alleging a mental impairment. (Tr. 35). Plaintiff testified that she is depressed most of the time and she experiences anxiety attacks. (Id.). Plaintiff stated that she was diagnosed with depression and anxiety by Dr. John Thadeus Lake and Dr. Majid. (Id.). Plaintiff testified that Dr. Lake is a psychiatrist at Southeast Hospital. (Id.). Plaintiff stated

that she last saw Dr. Lake in November of 2006. (Id.). The ALJ noted that she did not have Dr. Lake's records. (Id.). Plaintiff's attorney indicated that he had ordered Dr. Lake's records and had not received them yet. (Id.).

Plaintiff testified that she was hospitalized for her mental impairments in 2004 or 2005. (Tr. 36). Plaintiff stated that she started counseling in February of 2007. (Id.). Plaintiff testified that she saw a counselor at Bootheel Counseling in 2005 before she went to prison. (Id.). Plaintiff stated that she did not receive any counseling from 2005 until February 2007. (Tr. 37).

Plaintiff's attorney then examined plaintiff, who testified that on a typical day, she spends most of her time alone in her room. (Id.). Plaintiff stated that she occasionally visits with her grandmother in the living room. (Id.). Plaintiff testified that she cries a lot. (Id.). Plaintiff stated that she lives with her grandmother, who is 81 years old. (Id.). Plaintiff testified that her grandmother takes care of her. (Id.). Plaintiff stated that she does not help with the household chores. (Id.). Plaintiff testified that she has crying episodes every day, which last from ten minutes to more than one hour. (Tr. 38). Plaintiff stated that she cries when she thinks about events from her past, including her father's death. (Id.).

Plaintiff testified that she does not do any shopping. (Id.). Plaintiff stated that she does not have a social life. (Id.). Plaintiff testified that she visits with a friend about once a week. (Id.). Plaintiff stated that she visits a friend who lives in Essex, Missouri, which is about four miles from her home. (Id.). Plaintiff testified that she occasionally drives to Essex to visit her friend and other times her friend picks her up at her home. (Tr. 39). Plaintiff stated that she drives to Essex once or twice a month. (Id.). Plaintiff testified that she usually stays at her friend's house for a couple hours, although she occasionally stays all night. (Id.).

Plaintiff stated that her mother comes to her grandmother's home to visit her. (Id.). Plaintiff testified that other family members and family friends come over to visit. (Id.). Plaintiff stated that people come to her home to visit her about once a month, and usually only stay for fifteen to twenty minutes. (Tr. 39-40). Plaintiff testified that she does not enjoy visiting with people for long periods. (Tr. 40). Plaintiff stated that she sees her visitors in the living room of her grandmother's home. (Id.).

Plaintiff testified that she watches television at night with her grandmother and occasionally watches television during the day. (Id.). Plaintiff stated that she reads the Bible frequently. (Id.). Plaintiff testified that she has no desire to do anything. (Id.). Plaintiff stated that she is seeing a counselor at Bootheel Counseling for this reason. (Id.). Plaintiff testified that she walks around the house with her grandmother because her grandmother encourages her to get up and get dressed. (Id.). Plaintiff stated that she has not walked outside yet, although her grandmother has suggested that she do so. (Tr. 41).

Plaintiff testified that she experiences shortness of breath when walking. (Id.). Plaintiff stated that she can only lift five to ten pounds due to right shoulder pain. (Id.). Plaintiff testified that she is left hand dominant. (Id.). Plaintiff stated that she does not cook, although she uses the microwave. (Id.). Plaintiff testified that she makes her bed but does not do any other housework. (Tr. 42). Plaintiff stated that her grandmother hires a cleaning person to clean the house twice a week. (Id.). Plaintiff testified that she does her own laundry. (Id.). Plaintiff stated that she does not participate in any social functions, belong to any clubs, or attend church. (Id.). Plaintiff testified that she does not work in the yard or garden. (Id.).

The ALJ indicated that she would leave the record open for three weeks in order for

plaintiff to obtain additional medical records.  (Tr. 43).

**B.      Relevant Medical Records**

The record reveals that plaintiff presented to Missouri Southern Healthcare with complaints of lumbar[2] muscle spasm on January 11, 2003.  (Tr. 543).  Plaintiff underwent x-rays of the lumbar spine, which revealed some mild degenerative changes of the thoracic and upper lumbar spine with straightening of the lumbar curvature.  (Tr. 544).  The impression of the radiologist was probable myofascial [3]spasm or strain with straightening of the lumbar curvature. (Id.).

Plaintiff presented to Nabil Majid, M.D. on April 3, 2003, with complaints of shoulder pain.  (Tr. 501).  Plaintiff underwent an MRI of the right shoulder on April 14, 2003, which revealed a possible labral tear.  (Tr. 537-38).

On December 9, 2004, plaintiff presented to Dr. Majid with complaints of being anxious, concerned about dying, and hearing voices.  (Tr. 480).  Plaintiff denied being suicidal or homicidal.  (Id.).  Plaintiff denied shortness of breath and pain, other than dental pain.  (Id.).  Dr. Majid's assessment was anxiety, dental abscess, and uncontrolled hypertension.  (Id.).  Dr. Majid

---

[2]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[3]Of or relating to the fascia surrounding and separating muscle tissue.  See Stedman's Medical Dictionary, 1272 (28th Ed. 2006).

prescribed Valium[4] and Prozac[5] for plaintiff's anxiety and medication for plaintiff's hypertension. (Id.). Plaintiff presented to Dr. Majid for a follow-up on December 16, 2004, at which time she reported that she was still depressed and was crying a lot. (Tr. 479). Dr. Majid's impression was hypertension, better controlled; and depression, with no panic attacks. (Id.). Dr. Majid continued plaintiff's Prozac and Valium and added Effexor.[6] (Id.). On January 7, 2005, plaintiff presented to Dr. Majid's clinic anxious and crying, reporting that she could not afford her medication. (Tr. 478). Judy Pedigo, FNP, diagnosed plaintiff with anxiety disorder and hypertension. (Id.). Ms. Pedigo gave plaintiff samples of Valium, Clonidine,[7] Effexor, and blood pressure medication. (Id.).

Plaintiff presented to K.P.S. Kamath, M.D. on January 10, 2005, for a psychiatric evaluation. (Tr. 586-87). Plaintiff reported crying for no reason, paranoia, and not wanting to leave her home. (Tr. 586). Dr. Kamath noted that plaintiff was so distraught throughout the interview that it was impossible to get any meaningful information from her. (Id.). Dr. Kamath stated that, even though there was a significant degree of conscious dramatization observed, plaintiff appeared to be significantly depressed, anxious, and agitated. (Id.). Plaintiff reported experiencing frequent panic attacks, which have caused her to become increasingly bedridden.

---

[4]Valium is indicated for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety. See Physician's Desk Reference (PDR), 2957 (59th Ed. 2005).

[5]Prozac is a psychotropic drug indicated for the treatment of major depressive disorder. See PDR at 1873-74.

[6]Effexor is an antidepressant indicated for the treatment of major depressive disorder. See PDR at 3321.

[7]Clonidine is indicated for the treatment of hypertension. See PDR at 988.

(Id.).  Plaintiff indicated that she was not taking her prescribed medications because she could not afford them.  (Id.).  Dr. Kamath diagnosed plaintiff with severe panic disorder[8] with agoraphobia;[9] major depression,[10] single episode, with psychotic features; personality disorder[11] with histrionic features; and assessed a GAF[12] of 50.[13]  (Tr. 587).  Dr. Kamath expressed the opinion that plaintiff's ability to relate to other people was poor, plaintiff was barely able to care for her basic personal needs, plaintiff had a marked constriction of interests and habits, plaintiff was unable to comprehend and follow instructions, unable to perform simple repetitive tasks, and her ability to cope with stress and pressures of routine work activity was poor.  (Id.).

On January 14, 2005, plaintiff presented to Dr. Majid anxious, shaky, in tears, and with

---

[8]Recurrent panic attacks that occur unpredictably.  See Stedman's at 570.

[9]A mental disorder characterized by an irrational fear of leaving the familiar setting of home, or venturing into the open, so pervasive that a large number of external life situations are entered into reluctantly or are avoided; often associated with panic attacks.  See Stedman's at 40.

[10]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness.  See Stedman's at 515.

[11]General term for a group of behavioral disorders characterized by usually lifelong ingrained maladaptive patterns of subjective internal experience and deviant behavior, lifestyle, and social adjustment, which patterns may manifest in impaired judgment, affect, impulse control and interpersonal functioning.  See Stedman's at 570.

[12]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[13]A GAF score of 41-50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 32.

complaints of insomnia. (Tr. 477). Plaintiff indicated that she was doubling her dosage of Valium at night to help with sleep. (Id.). Dr. Majid diagnosed plaintiff with anxiety disorder with frequent panic attacks, insomnia, and tachycardia[14] related to anxiety. (Id.). Dr. Majid instructed plaintiff to take her Valium only as directed. He discontinued the Effexor and started plaintiff on Zyprexa[15] and Ambien.[16] (Id.). Plaintiff presented to Dr. Majib for a follow-up on January 27, 2005, at which time she reported she was doing "much better." (Tr. 476). On physical examination, plaintiff's blood pressure and heart rate were much better controlled. (Id.). Dr. Majid noted that plaintiff was not in tears, was not anxious, and had no apparent pain. (Id.). Dr. Majid's assessment was anxiety disorder-much better, no recent panic attacks; and hypertension-better controlled. (Id.). Dr. Majid continued plaintiff's medications. (Id.). Plaintiff presented to Dr. Majid on February 10, 2005, with complaints of leg swelling. (Tr. 475). Plaintiff had gained six pounds since her last appointment and admitted to some snoring and daytime sleepiness. (Id.). Plaintiff reported experiencing crying episodes. (Id.). Dr. Majid's assessment was anxiety disorder-severe, no recent panic attacks; hypertension-needs better control; insomnia-better; and leg edema, daytime sleepiness, snoring at night-all manifestations of obstructive sleep apnea.[17] (Id.). Dr. Majid increased plaintiff's Valium and Zyprexa and scheduled a sleep study. (Id.).

---

[14]Rapid beating of the heart. See Stedman's at 1931.

[15]Zyprexa is a psychotropic drug indicated for the treatment of schizophrenia and bipolar disorder. See PDR at 1899-1900.

[16]Ambien is indicated for the short-term treatment of insomnia. See PDR at 2980.

[17]A disorder characterized by recurrent interruptions of breathing during sleep due to temporary obstruction of the airway with resultant hypoxemia and chronic lethargy. See Stedman's at 119.

Plaintiff presented to Dr. Majid on February 22, 2005, with complaints of continuous anxiety, especially when she is alone, although she indicated that she was generally better. (Tr. 474). Dr. Majid's assessment was obsessive compulsive disorder[18]-patient is still anxious and having the same symptoms, however she is much better; anxiety disorder-no recent panic attacks; depression-no homicidal or suicidal ideations; tachycardia; and possible obstructive sleep apnea. (Id.). Dr. Majid increased plaintiff's Zyprexa, continued her other medications, and referred her to counseling for psychological assessment evaluation and management. (Id.). On March 2, 2005, plaintiff presented with complaints of heartburn and drowsiness due to Ambien. (Tr. 473). Dr. Majid prescribed Zantac[19] and reduced plaintiff's dosage of Ambien. (Id.).

Plaintiff presented to Bootheel Counseling on March 3, 2005, for an evaluation at the request of Dr. Majid. (Tr. 369-71). Plaintiff appeared agitated and slightly paranoid. (Tr. 369). Plaintiff reported moodiness, irritability, fluctuation in energy levels, loss of interest in activities, auditory hallucinations, and some paranoia. (Id.). Plaintiff displayed poor concentration and memory and relied on her grandmother to discuss some details. (Id.). Plaintiff appeared very distressed. (Id.). Angela Lutmer, M.A., clinical therapist, diagnosed plaintiff with bipolar I disorder,[20] most recent episode mixed, severe with psychotic features; obsessive-compulsive

---

[18]A type of anxiety disorder the essential features of which include recurrent obsessions, persistent intrusive ideas, thoughts, impulses or images, or compulsions sufficiently severe to cause marked distress, be time-consuming, or significantly interfere with the person's normal routine, occupational functioning, usual social activities, or relationships with others. See Stedman's at 570.

[19]Zantac is indicated for the treatment of ulcers and GERD. See PDR at 1671.

[20]An affective disorder characterized by the occurrence of alternating (e.g., mixed, manic, and major depressive) episodes. See Stedman's at 568.

disorder by history; and assessed a current GAF of 45,[21] with the highest GAF in the past year of 65.[22] (Tr. 371).

Plaintiff presented to Dr. Majid on March 14, 2005, with complaints of increased leg edema. (Tr. 472). Dr. Majid's assessment was leg edema, secondary to weight and varicose veins, obstructive sleep apnea was ruled out by sleep study; and right upper extremity shooting pain, suggestive of neuropathy,[23] although she did not have the pain at the present time. (Id.). Dr. Majid advised plaintiff to lose weight through exercise and diet, and prescribed Neurontin.[24] (Id.).

Plaintiff presented to Chul Kim, M.D., for a consultative examination at the request of the state agency on March 17, 2005. (Tr. 572-75). Plaintiff complained of upper back and right upper extremity pain after falling two years prior. (Tr. 572). Plaintiff reported pain in the right upper back over the shoulder blade that goes to the right side of the neck and goes down the right shoulder and right arm and causes the right hand to become numb. (Id.). An MRI revealed rotator cuff injury to the right shoulder but surgery was not considered. (Id.). Plaintiff was referred to a pain clinic but she did not see the doctor due to an alleged inability to afford

---

[21]A GAF score of 41-50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 32.

[22]A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

[23]A classic term for any disorder affecting any segment of the nervous system. See Stedman's at 1313.

[24]Neurontin is indicated for the treatment of postherpetic neuralgia. See PDR at 2590.

treatment.  (Id.).  Upon examination, plaintiff's upper back on right scapula area was tender, but there was no significant swelling, deformity, heat, or limitation of the range of motion in any major joint in the upper extremities.  (Id.).  Plaintiff had some limited range of motion of the neck with pain in the right side of the neck and lumbar spine.  (Tr. 573).  Handgrip and fine finger movement were normal.  (Id.).  No edema was noted in the legs.  (Id.).  Plaintiff's neurological examination was nonspecific including sensory, motor, reflex, and muscle mass.  (Id.).  Dr. Kim's impression was chronic pain in the right upper back radiating to the right side of the neck and right upper extremity along with numbness in the right hand and previous MRI scan reported rotator cuff injury in right shoulder.  (Id.).

Plaintiff presented to A. Corral, M.D. on March 21, 2005.  (Tr. 580-81).  Plaintiff reported a chronic history of polysubstance abuse for many years.  (Tr. 581).  Plaintiff indicated that under the influence of these drugs, she usually becomes psychotic and starts hallucinating. (Id.).  Plaintiff also reported having a lot of anxiety and depression.  (Id.).  During the interview, plaintiff was fluctuating and having crying spells.  (Id.).  Dr. Corral's impression was polysubstance abuse to methamphetamine and cannabis; major depression; rule out bipolar disorder; borderline personality disorder;[25] and a GAF of 50.  (Id.).  Dr. Corral recommended that plaintiff's medications be adjusted and that at least five of her medications be discontinued.  (Id.).

Plaintiff presented to Jana Paddock, MRC, LPC, at Bootheel Counseling on April 8, 2005.

---

[25]An enduring and pervasive pattern that begins by early adulthood and is characterized by impulsivity and unpredictability, unstable interpersonal relationships, inappropriate or uncontrolled affect, identity disturbances, rapid shifts of mood, suicidal acts, self-mutilations, job and marital instability, chronic feelings of emptiness or boredom, and intolerance of being alone.  See Stedman's at 568.

(Tr. 352-54). Ms. Paddock found that plaintiff had above normal intellect, poor insight, and poor judgment. (Tr. 354). Ms. Paddock assessed a GAF of 40.[26] (Id.).

Plaintiff presented to Ms. Paddock on April 8, 2005, with reports of OCD behavior. (Tr. 346). Ms. Paddock found that plaintiff's behavior was caused by her paranoia rather than OCD. (Id.). Ms. Paddock noted that plaintiff reported past methamphetamine and IV drug use, which she may have minimized due to the presence of her grandmother during the interview. (Id.). Ms. Paddock stated that plaintiff had problems with memory and was rather confused at the time of the assessment. (Id.). Ms. Paddock noted that plaintiff reported working as a confidential informant for local police, which may be a delusion. (Id.). Plaintiff also reported that law enforcement had been trying to frame her. (Id.). Ms. Paddock's assessment was bipolar disorder I, mixed, severe with psychotic features; rule out amphetamine abuse; a current GAF of 40. (Tr. 347).

Plaintiff presented to Dr. Majid on April 27, 2005, for a regular follow-up and medication refills. (Tr. 471). Plaintiff indicated that she was stressed out from some social issues and that she wanted to check herself into the stress unit at Southeast Hospital. (Id.). Plaintiff admitted to hearing voices and fearing that someone would harm her, yet denied any homicidal or suicidal ideations. (Id.). Plaintiff was anxious and in tears. (Id.). Dr. Majid's assessment was anxiety disorder-no recent panic attacks; depression as a component of bipolar disorder; insomnia-better; and tachycardia. (Id.). Dr. Majid advised plaintiff to check herself into the stress unit. (Id.).

---

[26]A GAF score of 31-40 denotes some impairment in reality testing or communication (e.g., speech is at time illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work). DSM-IV at 32.

Plaintiff saw a counselor from Bootheel Counseling at her home on April 27, 2005. (Tr. 336). Plaintiff reported high anxiety and hearing voices. (Id.). Plaintiff indicated that she would check herself into the stress unit at Southeast Hospital although she did not want to do so that day. (Id.).

Plaintiff presented to the emergency room at Southeast Missouri Hospital on April 29, 2005, with worsening symptoms of depression and suicidal thinking. (Tr. 406-13). Plaintiff was evaluated by a crisis counselor and was admitted to the Psychiatric Unit for further evaluation, safety, and treatment. (Tr. 406). Plaintiff complained of depression, difficulty sleeping, hearing voices, and anxiety. (Tr. 410). Plaintiff reported that she had last used methamphetamines and marijuana one week prior. (Id.). Robert E. McCool, M.D. diagnosed plaintiff with major depression with possible psychotic features, cannabis and methamphetamine abuse, and assessed a GAF of 45. (Tr. 412). Plaintiff's dosage of Valium was reduced due to her ongoing substance abuse, and she was started on Seroquel[27] to help with quasi-psychosis and mood stabilization. (Tr. 406). John Thadeus Lake, M.D. evaluated plaintiff on May 2, 2005, at which time he found that plaintiff had improved on her current medications, with prominent signs of personality disorder. (Id.). Dr. Lake found that plaintiff's suicide risk assessment was low and that plaintiff was able to be managed on an outpatient basis at the Bootheel Counseling Center. Plaintiff was discharged to home in stable condition. (Id.). Plaintiff's discharge diagnosis was major depressive disorder, with psychotic features; cannabis and methamphetamine abuse; personality disorder with borderline traits; and a GAF of 55. (Tr. 406-07).

---

[27]Seroquel is a psychotropic drug indicated for the treatment of bipolar mania and schizophrenia. See PDR at 663.

Plaintiff saw a counselor at her home on May 2, 2005. (Tr. 333). Plaintiff had recently been discharged from the stress unit at Southeast Hospital and reported that she was feeling better. (Id.).

Plaintiff saw a counselor at the Stoddard County Jail on May 10, 2005. (Tr. 332). Plaintiff reported that she was in jail due to a warrant from the previous year issued as a result of not cooperating with law enforcement when her husband was arrested for manufacturing methamphetamine. (Id.). Plaintiff indicated that she was taking her medication. (Id.). On June 27, 2005, plaintiff reported that she was out of medication and that she had not been able to see a doctor. (Tr. 329).

Plaintiff presented to Dr. Majid on December 1, 2005, for a regular follow-up and medication refills. (Tr. 470). Plaintiff indicated that she had been incarcerated and was released a few weeks prior. (Id.). Plaintiff had been off of her medications. (Id.). Plaintiff complained of hallucinations, depression, and anxiety. (Id.). Dr. Majid's assessment was hypertension-needs better control; hallucinations; depression; and anxiety disorder. (Id.). Dr. Majid encouraged plaintiff to sign herself into the psychiatric ward in Poplar Bluff and plaintiff was agreeable. (Id.). On December 15, 2005, plaintiff reported that she had lost her Valium in a car wreck and requested more medication. (Tr. 469). Dr. Majid's assessment was anxiety disorder-no recent panic attacks; depression-no homicidal or suicidal ideations; and hypertension-well controlled. (Id.). Dr. Majid gave plaintiff a one-month supply of Klonopin[28] and instructed her to be more responsible about her medication. (Id.). On February 9, 2006, plaintiff reported that the Klonopin had not been curbing her anxiety and that the Valium worked better. (Tr. 468).

---

[28]Klonopin is indicated for the treatment of panic disorder. See PDR at 2895.

Plaintiff indicated that she had recently been hospitalized for anxiety and depression and that she felt much better. (Id.). Plaintiff appeared anxious and ground her teeth frequently. (Id.). Plaintiff requested STD testing. (Id.). Dr. Majid's assessment was depression-no homicidal or suicidal ideations; anxiety disorder-no recent panic attacks since discharge from the hospital; and obesity-the patient continues to gain weight. (Id.). Dr. Majid discontinued Klonopin and started Celexa[29] and Valium. (Id.). He also referred plaintiff for a sleep study to rule out obstructive sleep apnea. (Id.).

Plaintiff presented to Ben Lanpher, Ph.D., for a psychological evaluation at the request of the state agency on March 1, 2006. (Tr. 561-63). Plaintiff reported experiencing suicidal thoughts on a daily basis. (Tr. 562). Plaintiff reported auditory hallucinations, with the last such experience occurring two nights prior. (Id.). Dr. Lanpher found that plaintiff was functioning within the average to high-average range of intellectual ability. (Tr. 563). He found that plaintiff exhibited symptoms of depression, with suicidal thoughts and rapidly changing affect. (Id.). Dr. Lanpher noted that plaintiff reported paranoid delusions and auditory hallucinations. (Id.). Dr. Lanpher diagnosed plaintiff with major depressive disorder-recurrent, severe, with psychotic features; history of polysubstance abuse; and assessed a current GAF of 40 with the highest GAF in the past year of 62. (Id.). Dr. Lanpher expressed the opinion that plaintiff was unimpaired in her ability to understand instructions; mildly impaired in her ability to remember instructions; moderately impaired in her ability to sustain concentration; moderately to markedly impaired in her ability to interact socially; and moderately impaired in her ability to adapt to her environment and persist in tasks. (Id.). Dr. Lanpher stated that it was uncertain to what extent her substance

---

[29]Celexa is indicated for the treatment of depression. See PDR at 1270.

abuse contributes to her emotional distress.  (Id.).

Plaintiff presented to Patrick Lecorps, M.D. for an examination at the request of the state agency on March 14, 2006.  (Tr. 559).  Plaintiff complained of right shoulder pain with limitation of motion.  (Id.).  Plaintiff was unable to abduct or externally rotate the right shoulder.  (Id.).  Plaintiff underwent x-rays of the right shoulder, which revealed possible impingement tendinitis[30] and osteoarthritis[31] of the acromioclavicular joint.  (Id.).  Dr. Lecorp stated that plaintiff should undergo an MRI of the right shoulder and possibly a nerve conduction study to rule out carpal tunnel syndrome in the right wrist.  (Id.).

On March 17, 2006, plaintiff presented to Dr. Majid with complaints of right shoulder pain due to a rotator cuff injury she sustained after a fall a few years prior.  (Tr. 467).  Upon physical examination, plaintiff had decreased range of motion on external rotation, internal rotation, and abduction of her right shoulder, with some tenderness.  (Id.).  Dr. Majid's assessment was insomnia-Ambien is not helping; right shoulder pain-patient is under work-up for rotator cuff syndrome by Dr. Lecuyer; depression-no homicidal or suicidal ideations; and Hepatitis C[32]

---

[30]Inflammation of a tendon.  Stedman's at 1944.

[31]Osteoarthritis is characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result; mainly affects weight-bearing joints.  See Stedman's at 1388.

[32]Inflammation of the liver due to viral infection.  About 75 percent of Hepatitis C infections give rise to chronic persistent infection.  A high percentage of these develop chronic liver disease leading to cirrhosis and possible hepatocellular carcinoma.  See Stedman's at 877.

infection.  (Id.).  He discontinued the Ambien, started plaintiff on Lunesta[33] and Ultram,[34] and referred plaintiff for a liver biopsy.  (Id.).

Plaintiff presented to Charles E. Lavalle, III, M.D., upon the referral of Dr. Majid on April 12, 2006.  (Tr. 434-35).  Dr. Lavalle's assessment was Hepatitis C infection.  (Tr. 435).  Dr. Lavalle educated plaintiff about Hepatitis C and scheduled an ultrasound-guided liver biopsy.  (Id.).

On April 13, 2006, plaintiff reported to Dr. Majid that Tylenol PM helped her sleep better than the Lunesta.  (Tr. 466).  Dr. Majid's assessment was anxiety disorder-no recent panic attacks; and insomnia-benefitted from Tylenol PM.  (Id.).  Dr. Majid gave plaintiff a prescription for Tylenol PM so plaintiff's insurance would pay for it.  (Id.).  On May 19, 2006, plaintiff complained of a sinus infection, right shoulder pain, and insomnia.  (Tr. 465).  Dr. Majid's assessment was sinusitis, right shoulder pain, and insomnia.  (Id.).  He prescribed antibiotic medication, Lidoderm patches.[35]  (Id.).

Plaintiff presented to Dr. Lavalle on May 24, 2006, for a follow-up after undergoing a liver biopsy.  (Tr. 427-28).  Dr. Lavalle stated that the liver biopsy revealed that the Hepatitis C was moderately active and had done little damage.  (Tr. 427).  Dr. Lavalle expressed the opinion that plaintiff could either start treatment or hold off on treatment.  (Id.).

On June 12, 2006, plaintiff presented to Dr. Majid with complaints of dental pain.  (Tr.

---

[33]Lunesta is indicated for the treatment of insomnia.  See PDR at 1793.

[34]Ultram is an analgesic indicated for the management of moderate to moderately severe pain.  See PDR at 2553.

[35]Lidoderm patch is indicated for relief of pain associated with postherpetic neuralgia.  See PDR at 1215-16.

464). Dr. Majid's assessment was dental pain secondary to dental infection; depression; anxiety disorder; and history of Hepatitis C infection. (Id.). He prescribed antibiotic medication for the dental infection and advised plaintiff to quit smoking and see a dentist. (Id.). On July 12, 2006, plaintiff presented for medication refills. (Tr. 463). Plaintiff indicated that the Celexa was not helping her depression much. (Id.). Dr. Majid's assessment was depression; hypertension-well controlled; and anxiety disorder-no recent panic attacks. (Id.). Dr. Majid started plaintiff on Cymbalta.[36] (Id.).

Plaintiff presented to Dr. Lavalle on August 2, 2006, at which time she indicated that she wished to start treatment of her Hepatitis C. (Tr. 425). Dr. Lavalle stated that starting treatment at that time was reasonable, although it could cause her severe depression and bipolar disorder to worsen. (Id.). Dr. Lavalle started plaintiff on Hepatitis C medications. (Id.). Plaintiff returned for a follow-up on August 30, 2006, at which time she reported side effects of fatigue, irritability, and anxiety. (Tr. 418). Dr. Lavalle's assessment was Hepatitis C, patient is tolerating her treatment fairly well. (Id.). Dr. Lavalle continued plaintiff's medications and instructed her to continue to follow-up with Dr. Majid regarding her mental impairments. (Id.).

Plaintiff presented to the emergency room at Missouri Southern Healthcare on October 23, 2006, after taking an overdose of her blood pressure medication. (Tr. 391-93). Plaintiff reported increased depression with suicidal ideations, which had worsened since starting therapy for Hepatitis C eight weeks prior. (Tr. 392). Mayur Ramesh, M.D. found that plaintiff had significant depression and anxiety at baseline. (Tr. 391). Plaintiff agreed to go to an inpatient

---

[36]Cymbalta is indicated for the treatment of major depressive disorder. See PDR at 3431.

psychiatric facility for further psychiatric care.  Plaintiff was discharged on October 24, 2006.  (Id.).

Plaintiff presented to Ms. Paddock at Bootheel Counseling on November 21, 2006, to resume services.  (Tr. 288-92).  Plaintiff reported that she was unable to sleep at night because she was afraid and that she did not want to be around people.  (Tr. 288).  Plaintiff reported experiencing suicidal ideation as recently as the previous night.  (Tr. 289).  Plaintiff also reported abusing alcohol as recently as the previous night.  (Tr. 291).  Plaintiff indicated that she did not perform any household chores and had no desire to do anything.  (Tr. 289).  Ms. Paddock diagnosed plaintiff with major depressive disorder, recurrent, severe with psychotic features; bipolar I disorder, most recent episode mixed; and polysubstance dependence, severe; and assessed a current GAF of 40.  (Tr. 291).

Plaintiff presented to the emergency room at Southeast Missouri Hospital on November 22, 2006, with complaints of severe depression with suicidal thoughts.  (Tr. 386-87).  Plaintiff denied using illicit drugs, and hearing voices.  (Tr. 386).  Plaintiff was admitted to the psychiatric unit for further evaluation and treatment.  (Id.).  Dr. Lake diagnosed plaintiff with bipolar II disorder;[37] history of polysubstance abuse; rule out personality disorder; and assessed a GAF of 45.  (Tr. 387).  Dr. Lake started plaintiff on Wellbutrin[38] and Topamax.[39]  (Id.).  Plaintiff responded well to these medications, her mood improved, and she achieved good mood stability.

----

[37]An affective disorder characterized by the occurrence of alternating hypomanic and major depressive episodes.  See Stedman's at 568.

[38]Wellbutrin is an antidepressant indicated for the treatment of depression.  See PDR at 1655-56.

[39]Topamax is indicated for treatment of seizures.  See PDR at 2542.

(Tr. 383). Plaintiff was discharged on November 25, 2006, at which time her diagnosis was bipolar disorder I, mostly depressed. (Id.).

Plaintiff underwent x-rays of the right hip on January 16, 2007, which revealed minimal osteoarthritic changes. (Tr. 382). Plaintiff also underwent x-rays of the lower spine, which revealed normal alignment. (Tr. 381).

Plaintiff presented to Bootheel Counseling on February 20, 2007, with complaints of depression, suicidal thoughts, anxiety, hearing voices, and mood swings. (Tr. 275-82). Plaintiff indicated that she had moved from Marble Hill back to Dexter and wanted to resume services. (Tr. 277). Ms. Paddock diagnosed plaintiff with severe bipolar II disorder and polysubstance abuse. (Tr. 273).

Plaintiff presented to Mairaj A. Khan, M.D., staff psychiatrist at Bootheel Counseling Services on May 24, 2007. (Tr. 601-03). Plaintiff had a history consistent with mood swings between depression, irritability, and agitation, although she was depressed for the most part at the current time. (Tr. 601). Dr. Khan noted that plaintiff's history of paranoia and psychotic symptoms was in the context of drug use or from withdrawal from drugs and that her psychomotor agitation, racing thoughts, hypomanic and manic symptoms were in the context of methamphetamine use. (Id.). Plaintiff had a history of multiple admissions with suicidal tendencies. (Id.). Dr. Khan diagnosed plaintiff with major depressive disorder, recurrent, severe with psychotic features; anxiety disorder, moderate, ongoing; methamphetamine dependence, severe, in reported remission; alcohol dependence, moderate, in reported remission; nicotine dependence, mild, ongoing; and assessed a GAF of 51. (Tr. 602).

# The ALJ's Determination

The ALJ made the following findings:

1.  The claimant meets the non-disability requirements for a Period of Disability and Disability Insurance Benefits as set forth in Section 216(I) of the Social Security Act through September 30, 2008.

2.  The claimant has not engaged in substantial gainful activity since her alleged onset date of disability.

3.  The claimant has medically determinable "severe" impairments at the second step of the sequential evaluation process.

4.  The medically determinable impairments do not meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  I find the claimant's allegations regarding her limitations are not credible for the reasons set forth in the body of the decision.

6.  I have carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments.

7.  The claimant retains the residual functional capacity to perform light exertional work. Light exertional work requires a maximum lifting of 20 pounds; frequent lifting of 10 pounds; and, standing or walking for six out of eight hours per day. The claimant is also limited to unskilled work.

8.  The claimant is unable to perform any of her past relevant work.

9.  The claimant is a younger individual.

10. She has a high school education and training as a licensed practical nurse, certified nurse's assistant, and a medical technician.

11. The claimant's skills from her past relevant work are transferable to other work.

12. Although the claimant's exertional limitations do not allow her to perform the full range of light work, Medical-Vocational Rule 202.22 can be used as a framework for a finding that the claimant is not disabled. I find that there are a significant number of jobs in the national economy that she could perform.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

(Tr. 25-26).

The ALJ's final decision reads as follows:

> It is the decision of the Administrative Law Judge that, based on the application filed on July 26, 2006, the claimant is not entitled to a Period of Disability or Disability Insurance Benefits under Sections 216(I) and 223, respectively, of the Social Security Act. The claimant is also not eligible for Supplemental Security Income Payments under Section 1614(a)(3)(A) of the Social Security Act.

(Tr. 26).

# Discussion

## A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry."

Id.

**B.**     <u>**The Determination of Disability**</u>

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. <u>See</u> <u>Ingram v. Chater</u>, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); <u>Fines v. Apfel</u>, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. <u>See</u> 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." <u>Id.</u> Age, education and work experience of a claimant are not considered in making the "severity" determination. <u>See</u> <u>id.</u>

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in

Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000). Application of the special procedures

required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Pratt, 956 F.2d at 834-35; Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

## C.    Plaintiff's Claims

Plaintiff raises two claims on appeal from the decision of the Commissioner.  Plaintiff first argues that the ALJ erred in assessing the credibility of plaintiff's subjective complaints of pain and limitation.  Plaintiff next contends that the ALJ erred in determining plaintiff's residual functional capacity.  The undersigned will discuss plaintiff's claims in turn.

## 1.    Credibility Assessment

Plaintiff argues that the ALJ erroneously found her subjective complaints of pain and limitation not credible.  Specifically, plaintiff contends that the ALJ improperly required objective medical evidence of pain.  Defendant contends that the ALJ properly applied the Polaski factors and found that plaintiff's subjective complaints were not credible.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the

medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.  See also Burress, 141

F.3d at 880; 20 C.F.R. § 416.929.

The undersigned finds that the ALJ's credibility determination regarding plaintiff's

subjective complaints of pain and limitations is not supported by substantial evidence in the record

as a whole.  The few credibility factors discussed by the ALJ are either not dispositive in

themselves or rely on factual errors.  For instance, the ALJ first states that plaintiff has a "busy

schedule of daily activities as has been previously noted in this decision."  (Tr. 23).  Specifically,

the ALJ stated that plaintiff testified that she performs household chores; visits with friends,

neighbors, and family members; reads; and listens to the radio.  (Tr. 21).  The ALJ noted that the

records indicate that plaintiff lives with her eight-year-old daughter, drives to visit her

grandmother and another friend in the next town, walks, and watches television.  (Id.).

First, many of the ALJ's findings are factually incorrect.  Plaintiff testified that she did not

help with the household chores and that her grandmother hired a cleaning service.  (Tr. 37, 42).

Plaintiff does not drive to visit her grandmother, as she lives with her grandmother.  (Tr. 37).

Plaintiff did not testify that she visited with neighbors or that she listened to the radio.  The ALJ

stated that plaintiff lives with her eight-year-old daughter.  (Tr. 21).  Plaintiff, however, does not

have any children.

Plaintiff did testify that she read the Bible, watched television, and walked around inside

the house when encouraged by her grandmother.  Plaintiff further testified that she had one friend

whom she visited about once a week and that family members came to her grandmother's house

to visit about once a month.  Significant daily activities may be inconsistent with claims of

disabling pain.  See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001).  The Eighth Circuit,

however, has repeatedly held that "the ability to do activities such as light housework and visiting

with friends provides little or no support for the finding that a claimant can perform full-time competitive work." Burress v. Apfel, 141 F.3d 875, 881 (8th Cir. 1998) (quoting Baumgarten v. Chater, 75 F.3d 366, 369 (8th Cir. 1996)). See also Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000) ("The ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work"); Ekeland v. Bowen, 899 F.2d 719, 722 (8th Cir. 1990) ("[A] claimant's ability to perform household chores does not necessarily prove that claimant capable of full-time employment").

Plaintiff's daily activities of reading, watching televison, and walking inside her home, and occasionally visiting with friends and family members cannot accurately be characterized as a "busy schedule of daily activities." (Tr. 23). These activities are not indicative of plaintiff's ability to sustain full-time work, nor are they inconsistent with plaintiff's complaints of pain and limitations. Further, plaintiff also testified that she spent a typical day in her room alone, had daily crying spells, and did not enjoy visiting with people for long periods. (Tr. 37, 40). The ALJ did not discuss this testimony. For these reasons, the ALJ's discrediting plaintiff's subjective complaints based on her daily activities was erroneous.

The ALJ next stated that plaintiff has gaps in her treatment for her mental impairments. (Tr. 23). The ALJ, however, fails to cite specific periods during which plaintiff failed to seek medical treatment. Contrary to the ALJ's assertion, the medical record reveals that plaintiff sought treatment for her mental impairments on approximately a monthly basis and, in some cases, even more often. The only gap in treatment during the relevant period is the time during which plaintiff was incarcerated, from May 2005 through November 2005. In fact, plaintiff even saw counselors from Bootheel Counseling during this period while she was incarcerated. (Tr.

332, 329).  As such, the ALJ's finding that plaintiff had gaps in treatment for her mental impairments is not supported by the record.

Finally, the ALJ discussed the medical evidence regarding plaintiff's physical impairments. The ALJ stated that the objective medical evidence does not support plaintiff's allegations of a disabling physical impairment.  While this is a factor upon which the ALJ may rely, it may not be solely relied upon by an ALJ to discredit a plaintiff's subjective complaints. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

In conclusion, the ALJ failed to give good reasons for discrediting plaintiff's complaints. Further, some of the alleged "inconsistencies" pointed to by the ALJ in his opinion rely on incorrect facts.  For these reasons, the ALJ's credibility analysis is lacking.  Accordingly, the undersigned will order that the decision of the Commissioner be reversed and this cause be remanded for a more thorough and accurate evaluation of plaintiff's subjective complaints of pain and limitations.

**2.      Residual Functional Capacity**

Plaintiff argues that the ALJ erred in determining her residual functional capacity. Defendant contends that the ALJ's residual functional capacity determination is supported by substantial evidence.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

> [b]ased on the testimony given at the hearing and the evidence of record, I find that the claimant retains the residual functional capacity to perform light exertional work.  Light exertional work requires a maximum lifting of 20 pounds; frequent lifting of no more than 10 pounds; and, standing and walking for six out of eight hours per day.  The claimant is also limited to unskilled work because of her mental impairments.

(Tr. 23).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

Here, the ALJ did not cite any medical evidence in support of her residual functional capacity determination. In fact, the ALJ provided no explanation whatsoever for her determination. Although Drs. Kim and Lecorps examined plaintiff at the request of the state agency, they did not provide opinions regarding plaintiff's functional limitations. Plaintiff's treating physician, Dr. Majid, has never provided an opinion regarding plaintiff's physical functional limitations. As such, there is no evidence in the record regarding plaintiff's physical ability to function in the workplace.

An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace. See Hutsell, 259 F.3d at 711-712; Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). Here, the ALJ's physical residual functional capacity assessment fails Lauer's test that the residual functional capacity be supported by *some* medical evidence. See Lauer, 245 F.3d at 703.

With regard to plaintiff's mental residual functional capacity, the ALJ simply found that plaintiff was limited to unskilled work due to her mental limitations. (Tr. 23). Drs. Kamath and Lanpher performed consultative psychological examinations and expressed opinions regarding plaintiff's functional limitations. Dr. Kamath diagnosed plaintiff with severe panic disorder with agoraphobia; major depression, single episode, with psychotic features; personality disorder with histrionic features; and assessed a GAF of 50. (Tr. 587). Dr. Kamath expressed the opinion that plaintiff's ability to relate to other people was poor, plaintiff was barely able to care for her basic personal needs, plaintiff had a marked constriction of interests and habits, plaintiff was unable to comprehend and follow instructions, unable to perform simple repetitive tasks, and her ability to cope with stress and pressures of routine work activity was poor. (Id.). Dr. Lanpher diagnosed plaintiff with major depressive disorder-recurrent, severe, with psychotic features; history of polysubstance abuse; and assessed a GAF of 40. (Id.). Dr. Lanpher expressed the opinion that plaintiff was unimpaired in her ability to understand instructions; mildly impaired in her ability to remember instructions; moderately impaired in her ability to sustain concentration; moderately to markedly impaired in her ability to interact socially; and moderately impaired in her ability to adapt to her environment and persist in tasks. (Id.).

The medical evidence of record reveals that plaintiff has severe mental impairments that result in significant functional limitations. Plaintiff has sought consistent treatment for her mental impairments and has had several psychiatric hospitalizations due to suicidal ideations. Plaintiff's mental health providers have consistently assessed low GAF score, ranging from 40 to 55. Further, Drs. Kamath and Lanpher both found that plaintiff had significant limitations in her ability to interact socially, sustain concentration, adapt to her environment and persist in tasks. The ALJ's mental residual functional capacity determination did not reflect these significant

limitations.  As such, the ALJ's mental residual functional capacity determination is not supported by substantial evidence.

Accordingly, the court will order that this matter be reversed and remanded to the ALJ in order for the ALJ to formulate a new residual functional capacity for plaintiff, based on the medical evidence in the record and to order, if necessary, additional medical information addressing plaintiff's ability to function in the workplace.  If the ALJ determines that plaintiff is unable to perform her past relevant work, then she should obtain testimony from a vocational expert due to the presence of non-exertional impairments.

## Conclusion

In sum, the decision of the ALJ finding plaintiff not disabled is not supported by substantial evidence.  The ALJ improperly assessed plaintiff's credibility and assessed a residual functional capacity that was not based on substantial medical evidence in the record.  For these reasons, this cause will be reversed and remanded to the ALJ for further proceedings consistent with this Memorandum.  Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this __30th__ day of March, 2009.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE